# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Nathan Wood, Special Agent with Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## PRELIMINARY BACKGROUND INFORMATION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the FBI Tucson Resident Agency (TRA), Tucson, Arizona. I have been a Special Agent since May of 2018. I am currently assigned to investigations involving crimes in Indian Country, which includes violent crime investigations. I have investigated these types of crimes during my career with the FBI. The statements contained in this Affidavit are based on my experience and background as a Special Agent and on information provided by other FBI Agents and law enforcement agents including officers/detectives of the Tohono O'odham Police Department.

2. Your affiant is charged with investigating violations of federal laws enumerated in Titles 18 and 21 of the United States Code. Pursuant to 18 U.S.C. § 3052, your affiant is empowered to enforce criminal laws of the United States and to execute search warrants issued under the authority of the United States. Pursuant to 18 U.S.C. § 3107, your affiant is empowered to make seizures under warrant for violation of the laws of the United States.

3. The facts of this case, as more fully detailed herein, are that Ianna Mesa did knowingly assault multiple victims with a dangerous weapon, that is, her vehicle, with intent to do bodily harm, in violation of Title 18, United States Code, Section 113(a)(3). In addition, Ianna Mesa did knowingly assault Q. J. resulting in substantial bodily injury, that is, a broken leg and broken jaw, in violation of Title 18, United States Code, Section 113(a)(6). Furthermore, these offenses were committed within Indian country, that is, the Tohono O'odham Indian Reservation and this Court has jurisdiction as the defendant, a registered and enrolled member of the Tohono O'odham Indian Nation did commit against three persons, all registered and enrolled members of the Tohono O'odham Indian Nation, a felony assault under Section 113 of Title 18, in violation of Title 18, United States Code,

Section 1153. It is requested that the Court issue a search warrant to search the SUBJECT VEHICLE:

> A 2015 red Honda CRV, VIN 2HKRM3H57FH524481, bearing Arizona registration plate 6MA65T, (SUBJECT VEHICLE), registered owner Ianna Mesa. SUBJECT VEHICLE is currently stored in the secured parking lot of the Federal Bureau of Investigation, field office in Tucson, AZ.

to locate evidence in and outside the vehicle related to the violations listed above.

4. This court has jurisdiction over these offenses under Title 18, United States Code, Sections 113(a)(3), 113(a)(6) and 1153 because the below-described events occurred within the confines of the Tohono O'odham Indian Reservation, Indian Country, in the District of Arizona, namely in Pima County, Arizona. Furthermore, this Court has jurisdiction to issue the requested warrant under Federal Rules of Criminal Procedure, Rule 41.

5. I submit this application and affidavit in support of a search warrant authorizing a search of the SUBJECT VEHICLE, including both the interior and exterior areas, further described in **Attachment A** and for items listed in **Attachment B**, incorporated herein by reference. The vehicle is currently stored in the secured parking lot of the FBI, at the Tucson field office, in Arizona. Your Affiant believes that located within and outside the SUBJECT VEHICLE is evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the SUBJECT VEHICLE for all evidence, including any suspected biological specimens, and any computer and computer media located therein where the items specified in **Attachment B** may be found, and to seize all items listed in **Attachment B** as contraband and instrumentalities, fruits, and evidence of the above-listed crimes.

6. The statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this investigation that I have received, directly or indirectly, from other law enforcement agents, and my experience, training, and background as a Special Agent with the FBI. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to show that there is sufficient probable cause for the requested warrant.

**PROBABLE CAUSE**

7. My basis for believing that evidence is located within the SUBJECT VEHICLE, including the infotainment and telematics system, is as follows:

8. On March 31, 2024, Tohono O'odham Police Department (TOPD) officers responded to a single vehicle rollover crash on State Highway 86 at approximately mile marker 82 located on the Tohono O'odham Nation Indian Reservation, in Pima County, in the District of Arizona. Upon arrival, TOPD officers observed Emergency Medical Services (EMS) on scene attending to two individuals on the ground near the driver's side of a rolled vehicle. The vehicle involved in the single motor vehicle crash was a red 2015 Honda CRV, bearing AZ registration plate 6MA65T (hereinafter referred to as SUBJECT VEHICLE). The SUBJECT VEHICLE was upside down on its top on the south side of the roadway facing in a southwest direction. The two individuals involved in the crash were later identified by TOPD as Ianna MESA (hereinafter referred to as MESA) and Q. J. MESA identified herself to TOPD as the driver of the vehicle. MESA was conscience, talking, and suffered minor injuries. Q. J. had a broken leg and was in and out of consciousness. Both MESA and Q. J. were transported by EMS to Banner University Medical Center Tucson.

9. As TOPD officers were conducting traffic control at the rollover site, R. R. contacted the TOPD officers. R. R. informed them of a separate incident that occurred earlier that morning with MESA, Q. J. D. E., and R. R.

10. During this investigation, R. R. was interviewed twice: March 31, 2024, and April 9, 2024. R. R. stated that on the night of March 30, 2024, she received a ride from MESA and Q. J. from Tucson, Arizona to a dance located in the Hickiwan District on the Tohono O'odham Nation Indian Reservation, in Arizona. At the dance, they all consumed alcohol. MESA and Q.J. were intoxicated and arguing to the point where TOPD separated and questioned them both. TOPD let MESA and Q. J. leave. Shortly thereafter, MESA, Q. J., E. D., and R. R. left the dance in the SUBJECT VEHICLE. MESA drove with R. R. and E. D. in the backseat and Q. J. in the front passenger seat. R. R. stated MESA was drunk and upset. MESA and Q. J. continued to argue in the SUBJECT VEHICLE. At some point, MESA stopped the SUBJECT VEHICLE and told

everyone to "get the fuck out." As Q. J., R. R., and E. D. exited the SUBJECT VEHICLE, MESA attempted to drive off. Q. J. ran in front of the SUBJECT VEHICLE and attempted to stop MESA from leaving. MESA revved the engine, drove forward, and hit Q. J. with the SUBJECT VEHICLE, running him over. Q. J.'s entire body went under the SUBJECT VEHICLE. R. R. thought Q. J. was dead, as R. R. heard the sound of breaking bones as Q. J. was run over and Q. J. looked like a "pretzel" lying in the road. Q. J.'s leg was "twisted", "facing the other direction", and "obvious" his leg was broken.

11. R. R. and E. D. ran to Q. J.'s aid. Before they could check for a pulse on Q. J., MESA reversed and backed the SUBJECT VEHICLE up so both R. R. and E. D. were now in front of the SUBJECT VEHICLE. MESA revved the engine and both R. R. and E. D. started to run. MESA drove towards R. R. and E. D. and struck them both with the front of the SUBJECT VEHICLE. R. R and E. D. were knocked to the ground. E. D. was unconscious. E. D. then regained consciousness. E. D. cried over and over again "I don't want to die, C (meaning R. R.), I don't want to die, she is going to kill us". R. R. also feared for her life and the life of E. D.

12. MESA stopped the SUBJECT VEHICLE near Q. J.'s body, picked him up, and put him back into the SUBJECT VEHICLE. R. R. heard Q. J. yelling at MESA, "you hit me; you hit me." MESA drove off with Q. J. and headed eastbound on State Highway 86 towards Tucson, Arizona.

13. E. D. called 911 to report the incident. R. R. called a friend to pick her up. On the way to Tucson, R. R. and her friend saw the rollover of the SUBJECT VEHICLE. R. R. contacted officers at the rollover scene and reported that MESA had hit her with the SUBJECT VEHICLE.

14. R. R. went to the hospital later that night. Doctors confirmed that R. R. had suffered severe internal trauma with a lot of bruising on her lower body.

15. R. R. reported she received a text from MESA after the incident asking R. R. if she was okay. R. R. also reported that she took videos while at the dance with her phone showing MESA and R. R. drinking alcohol.

16. On April 5, 2024, law enforcement officers conducted an interview with Q. J. Q. J. reported that he did not remember much from that night because he was drunk, tired, and sleeping off and on. Q. J. remembered drinking on the way to the dance. Q. J. stated MESA drove her red 2015 Honda

CRV with R. R. in the passenger seat. At the dance, Q. J. argued with MESA, but could not recall the argument. After the dance, R. R. drove the SUBJECT VEHICLE and headed home. Q. J. was in the back seat and MESA was in the front passenger seat. Q. J. stated E. D. could have been in the SUBJECT VEHICLE, but he did not remember. R. R. and MESA were arguing and R. R. stopped the SUBJECT VEHICLE. R. R. and MESA both exited the SUBJECT VEHICLE and MESA got into the driver's seat. MESA left R. R. on the side of the road. Q. J. remained in the back seat. Q. J. remembered the rollover accident. Q. J. stated that he remembered waking up in the hospital. Q. J. believed his injuries were due to him not wearing a seatbelt during the rollover. Q. J. was wearing size 14 khaki-colored Timberland steel-toed boots that night. Detective Rivas showed Q. J. a picture of a boot recovered from Federal Route 86 at approximately mile marker 68, where R. R. stated Q. J. was run over. Q. J. confirmed the boot was his. Q. J. stated that while he did not remember being hit, he would not be surprised that MESA hit him with the SUBJECT VEHICLE and ran over his leg. Q. J. suffered a broken leg, broken jaw, road rash on his upper and lower body, and cuts to the back of his head.

17. MESA is the registered owner of the SUBJECT VEHICLE. The SUBJECT VEHICLE was towed to Deer Dancer Towing in the Village of ChuiChu, located on E Chuichu Road, which is a secured yard authorized by TOPD. The SUBJECT VEHICLE was later towed to FBI TRA and parked in a secured parking lot in Tucson, Arizona.

18. Law enforcement officers could see, from outside the SUBJECT VHEICLE, one khaki-colored boot, a pair of jeans and other clothing in the SUBJECT VEHICLE. Agents/officers believe the clothing and boot could contain evidence indicating they were worn during the assaults.

**TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS BLACK BOX RECORDER, INFOTAINMENT, AND TELEMATICS SYSTEMS**

19. Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

20. Many modern motor vehicles are equipped with sensors, cameras,[1] transmitters, and electronic

---

[1] As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

control units (ECUs)[2] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.[3] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation, wireless telephone, and multimedia streaming. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

21. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

22. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front

---

[2]  "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

[3]  The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

dashboard of the vehicle.

23. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed, or brakes were engaged.

24. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

25. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

26. I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously-connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after

the commission of a crime.

27. As previously stated, the SUBJECT VEHICLE is a 2015 red Honda CRV, VIN 2HKRM3H57FH524481, bearing Arizona registration plate 6MA65T. To complete a forensic extraction from the SUBJECT VEHICLE, it may be necessary, temporarily, to remove trim and other components of the SUBJECT VEHICLE to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within the SUBJECT VEHICLE. In the event that potentially destructive processes are required to perform this extraction, parts of the SUBJECT VEHICLE may be destroyed and rendered useless.

28. Furthermore, it may be necessary to return to the SUBJECT VEHICLE and reconnect the infotainment and telematics systems to the SUBJECT VEHICLE's power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

29. The requested warrant authorizes a later review of the media and information seized or copied from the SUBJECT VEHICLE, which review may continue past the date required for execution of the warrant.

## CONCLUSION

30. I submit that this affidavit supports probable cause for a warrant authorizing the search of the SUBJECT VEHICLE, including the interior and exterior areas, and extraction and forensic examination of electronically stored information within the SUBJECT VEHICLE (as described in Attachment A) to seize the data described in Attachment B. The items and data will provide evidence related to the crimeS involving Assault Resulting in Serious Bodily Injury, in violation of Title 18, United States Code, Sections 113(a)(6) and 1153. and Assault with a Dangerous Weapon, in violation of Title 18, United States Code, Sections 113(a)(3) and 1153.

31. I swear under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Respectfully Submitted,

NATHAN WOOD
Digitally signed by NATHAN WOOD
Date: 2024.05.13 12:37:39 -07'00'

Special Agent Nathan Wood
Federal Bureau of Investigation

Subscribed electronically and sworn telephonically to me on this __13th__ day of May, 2024.

_____
Honorable Michael A. Ambri
United States Magistrate Judge